UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY LEE ROBINSON, | ) 1:10-cv—00133-LJO-BAM-HC |
| | ) |
|                Petitioner, | ) ORDER SUBSTITUTING WARDEN CONNIE |
| | ) GIPSON AS RESPONDENT |
| | ) |
|    v. | ) FINDINGS AND RECOMMENDATIONS TO |
| | ) DENY PETITIONER'S REQUEST FOR AN |
| CONNIE GIPSON, Warden, | ) EVIDENTIARY HEARING, DENY THE |
| | ) PETITION FOR WRIT OF HABEAS |
|               Respondent. | ) CORPUS (DOC. 1), ENTER JUDGMENT |
| | ) FOR RESPONDENT, AND DECLINE TO |
|                             | ) ISSUE A CERTIFICATE OF |
| | ) APPEALABILITY |

Petitioner is a state prisoner proceeding with counsel pursuant to 28 U.S.C. § 2254.  The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.  Pending before the Court is the petition, which was filed on January 26, 2010.  Respondent filed an answer to the petition and the state court record on October 18, 2010. Petitioner filed a traverse with attached points and authorities on January 20, 2011.

I.  Jurisdiction

Because the petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding.  Lindh

1

1  v. Murphy, 521 U.S. 320, 327 (1997), cert. denied, 522 U.S. 1008

2  (1997); Furman v. Wood, 190 F.3d 1002, 1004 (9th Cir. 1999).

3       A district court may entertain a petition for a writ of

4  habeas corpus by a person in custody pursuant to the judgment of

5  a state court only on the ground that the custody is in violation

6  of the Constitution, laws, or treaties of the United States.  28

7  U.S.C. §§ 2254(a), 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

8  375 n.7 (2000); Wilson v. Corcoran, 562 U.S. –, –, 131 S.Ct. 13,

9  16 (2010) (per curiam).

10      Here, Petitioner claims that in the course of the

11  proceedings resulting in his conviction, he suffered violations

12  of his Sixth and Fourteenth Amendment rights.  Thus, violations

13  of the Constitution are alleged.

14      Further, the conviction challenged arises out of the Kern

15  County Superior Court (KCSC), which is located within the

16  jurisdiction of this Court.  28 U.S.C. §§ 2254(a), 2241(a), (d).

17      On August 17, 2010, Respondent's counsel filed a notice of

18  appearance for Respondent Derral G. Adams, who was then the

19  warden at the California State Prison at Corcoran (CSP-COR).

20  Petitioner thus named as a respondent a person who had custody of

21  Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a)

22  of the Rules Governing Section 2254 Cases in the District Courts

23  (Habeas Rules).  See, Stanley v. California Supreme Court, 21

24  F.3d 359, 360 (9th Cir. 1994).

25      In summary, it is concluded that this Court has subject

26  matter jurisdiction over this action and in personam jurisdiction

27  over the Respondent.

28  ///

1    II.   Substitution of Respondent Gipson

2        Fed. R. Civ. P. 25(d) provides that an action does not abate

3    when a public officer who is a party in an official capacity

4    dies, resigns, or otherwise ceases to hold office while the

5    action is pending; rather, the officer's successor is

6    automatically substituted as a party.   The rule further provides

7    that a court may at any time order substitution, but the absence

8    of such an order does not affect the substitution.

9        The official website of the California Department of

10   Corrections and Rehabilitation (CDCR)[1] reflects that Connie

11   Gipson is presently acting as the warden of CSP-COR.

12       Accordingly, pursuant to Rule 25(d), it is ORDERED that

13   Warden Connie Gipson is SUBSTITUTED as Respondent.

14   III.   Procedural Summary

15       By an information filed on May 8, 2006, Petitioner was

16   charged with having murdered Kenneth Dewayne Moses on February

17   18, 2006, in violation of Cal. Pen. Code § 187; having used a

18   deadly or dangerous weapon in the commission of the offense in

19   violation of Cal. Pen. Code § 12022(b); and having suffered a

20   prior felony conviction followed by a prison term without having

21   remained free of custody for five years within the meaning of

22   Cal. Pen. Code § 667.5(b).   (I CT 142-43.)

23       Petitioner's jury trial commenced on August 14, 2006, and

24   concluded on August 23, 2006.   (I CT 174, 203, 227-29, 245-47,

25

26       [1]The Court may take judicial notice of facts that are capable of
     accurate and ready determination by resort to sources whose accuracy cannot
     reasonably be questioned, including undisputed information posted on official
27   web sites.  Fed. R. Evid. 201(b); United States v. Bernal-Obeso, 989 F.2d 331,
     333 (9th Cir. 1993); Daniels-Hall v. National Education Association, 629 F.3d
28   992, 999 (9th Cir. 2010).  The address of the official website for the CDCR is
     http://www.cdcr.ca.gov.

251-59, 263-65, II CT 431-32, 435-36.)  The jury found Petitioner guilty of first degree murder and having personally used a deadly or dangerous weapon, namely, a knife, in the commission of the offense.  (II CT 431, 434.)  Petitioner waived his right to a trial by jury on the allegation concerning the prior conviction and admitted the allegation.  (I CT 265.)

On September 21, 2006, Petitioner was sentenced to a term of twenty-five years to life for the murder and an additional two years for the enhancements for the weapon use and prior prison term.  (II CT 447-51.)

Petitioner filed a timely appeal, and the judgment was affirmed in its entirety by the California Court of Appeal, Fifth Appellate District (CCA), in case number F051308 on February 15, 2008.  (II CT 454, LD 4.)[2]

Petitioner filed a petition for review in the California Supreme Court (CSC) on April 3, 2008.  (LD 5.)  On May 21, 2008, the CSC denied Petitioner's petition for review in case number S162306.  (LD 6.)

Petitioner filed a petition for writ of habeas corpus in the CSC on July 31, 2009.  (LD 7.)  The CSC denied the petition in case number S175096 on January 21, 2010, without a statement of reasoning or authority.  (LD 8.)

Petitioner filed the petition in this proceeding on January 26, 2010.  (Doc. 1.)

IV.  Factual Summary

In a habeas proceeding brought by a person in custody

---

[2] "LD" refers to documents lodged by Respondent in response to the petition.

pursuant to a judgment of a state court, a determination of a

factual issue made by a state court shall be presumed to be

correct; the petitioner has the burden of producing clear and

convincing evidence to rebut the presumption of correctness.  28

U.S.C. § 2254(e)(1); Sanders v. Lamarque, 357 F.3d 943, 947-48

(9th Cir. 2004).  The following factual summary is taken from the

opinion of the California Court of Appeal, Fifth Appellate

District, in People v. Robinson, case number F051308.  See,

Galvan v. Alaska Dep't. Of Corrections, 397 F.3d 1198, 1199 n.1

(9th Cir. 2005) (setting forth a factual summary from the state

appellate court's decision).

> Responding to a bystander's 911 call, police and
> emergency medical personnel came to Valley Plaza, a
> mall in Bakersfield, on the afternoon of February 18,
> 2006. They found Kenneth Dewayne Moses lying on his
> back in the parking lot. His clothes were bloody and he
> had several stab wounds. When a police officer asked
> what happened, Moses said, "'Jimmy did it.'"

> Moses was taken to a hospital. An emergency room
> physician observed the stab wounds, including one in
> the left side of Moses's chest over the location of his
> heart. The doctor performed emergency surgery to try to
> treat Moses's internal injuries and in the process saw
> that this wound pierced the heart. Moses died 20
> minutes after emergency treatment began. An autopsy
> found that, in addition to the chest wound that pierced
> the heart, Moses had stab wounds in five other
> locations. First, a wound to the left side of the neck
> was two and a half centimeters long and penetrated four
> and a quarter inches into the neck. Second, a wound on
> the front of the right shoulder consisted of two
> separate V-shaped cuts. One cut was one centimeter
> long, the other was one and a half centimeters long,
> and both were two and a half inches deep. The third
> wound was on the top of the right shoulder, 1.3
> centimeters long and three quarters of an inch deep.
> The fourth wound was in the center of Moses's back and
> consisted of two separate V-shaped cuts. One was 1.6
> centimeters long, the other was 2.4 centimeters long,
> and both were one and three quarters inches deep. The
> fifth wound was also in Moses's back and also consisted
> of two separate V-shaped cuts. One was one and a half
> centimeters long, the other was 2.1 centimeters long,

and both were one and three quarters inches deep. The chest wound that pierced the heart was three and a quarter inches deep. Counting the two-part wounds as two cuts, Moses was cut a total of nine times. The stab wounds were the cause of death.

The district attorney filed an information charging defendant with willful, deliberate, and premeditated murder. (Pen.Code, § 187.) FN1 The information also alleged that defendant used a knife to commit the offense (§ 12022, subd. (b)) and had served a prior prison term (§ 667.5, subd. (b)). Defendant's wife, Jennifer Robinson, was named as a codefendant and charged with harboring or concealing a felon. (§ 32.)

> FN1. Subsequent statutory references are to the Penal Code.

At trial, the parties presented background facts about the relationship between Jennifer Robinson and Moses. They were involved in a romantic relationship from 1998 to 2000, living together part of the time. Jennifer testified that the relationship "was off and on" and that "there was a lot of cheating ... on his part." She described him as demanding, possessive, and intimidating. She believed he had physically abused a former girlfriend. She ended the relationship and demanded that he move out of their apartment after an incident in which he shoved her against an air conditioner and broke it.

After this, according to Jennifer, Moses made unwelcome contacts with her on many occasions. He frequently appeared at her home. Sometimes he banged on the doors and windows, attempting to convince Jennifer to let him in. On one of these occasions, she opened the door and he forcibly tried to kiss her. Other times he simply drove by. He also appeared, uninvited, at her workplace and left unwanted telephone messages for her at that location. Jennifer married defendant in 2001, but Moses's attempts to contact her continued after this time. They intensified during a period in 2004 and 2005 when Jennifer and defendant were separated.

As Jennifer described it, an attempt to confront Moses about these unwanted contacts resulted in the meeting that ended in Moses's death. Defendant asked Jennifer to get Moses's cell phone number so he could "talk to him just to clear things up." A mutual friend gave it to her, but she never used it. Later, on the day of the stabbing, the friend called Jennifer with a message from Moses: "[H]e's not mad at you and he's at Que Pasa Restaurant" at Valley Plaza. Jennifer decided to go to the restaurant to tell Moses to leave her alone. Defendant wanted her not to go. In the end, they both

went, driving separate cars.

Jennifer arrived at the mall and saw Moses leave the restaurant, walk into the parking lot, and open the passenger door of a car. She approached and yelled at him to stay away from her and not contact her. Moses asked why she had asked their mutual friend for his phone number. About this time, defendant arrived, got out of his car, and approached. According to Jennifer, Moses then reached in his coat and defendant stepped between them. Jennifer recalled that when she lived with Moses, he possessed a handgun. She had told defendant about this fact.

Several witnesses saw the ensuing fight. Jennifer testified that she saw Moses pull defendant's sweatshirt off over his head and saw defendant on the ground at one point. She said that, as defendant was getting in the car to leave after the fight, Moses was running after him.

Arlene Freeborn, driving in the parking lot, saw defendant appearing very angry and advancing on Moses "[w]ithout breaking stride, without missing a beat" until he "jumped" Moses. Then she saw them wrestling on the ground. She was certain it was defendant who attacked Moses, not the other way around. Freeborn described them as the "slim" man and the "husky" one and could not otherwise identify them, but there does not appear to be any dispute that the man she said she saw advancing was defendant and the other man was Moses. Moses was six feet two and a half inches tall and weighed 213 pounds; defendant was 5 feet 10 inches tall and weighed 205 pounds.

Mark Washington, though claiming total ignorance of the incident at trial, gave two detectives an extensive account of what he saw. As he was driving through the parking lot, he saw Moses leave the mall and walk to a car. He saw Jennifer walk up and argue with Moses. Then he saw defendant and Moses fighting; defendant was holding Moses in a headlock and forced Moses to the ground. Defendant released Moses and stood up. Moses also got up, with blood coming from his neck. He staggered toward defendant. Defendant staggered backward and took a fighting stance. Jennifer, who was in a car now, said "Let's go." Defendant got in and they drove away. Moses staggered toward the car and fell to the ground.

J., a minor, was at the mall with his family. He was entering the parking lot when he saw the conflict between defendant and Moses. J. testified that he saw defendant approach Moses using bad language. Moses kept walking. Then J. saw defendant slam Moses onto the ground and saw the two of them wrestling. He also saw

7

Jennifer grab defendant and say, "Come on baby, let's go," before the two of them fled the parking lot. J. did not see them get in a car. As they fled, Moses got up and slowly attempted to chase them. By that time, Moses was bloody.

R., also a minor, came to the mall on a bus and saw defendant and Moses fighting as he crossed the parking lot toward the mall entrance. One of the two fighting men said, "'Get this man off me before I kill him.'" R. did not know which man said it. He saw Moses grab defendant's shirt and hold it. He also saw defendant strike Moses on the left side of the neck and he saw Moses bleeding. Defendant got in a car that was waiting nearby and was driven away. Moses collapsed on the ground.

Karen Berry testified that, while driving in the parking lot of the mall, she saw Jennifer reaching for her shoes underneath a car, while defendant and Moses were wrestling on the ground. The two men got up and defendant walked toward the car; Moses followed behind defendant, chasing him. Jennifer raised one of her shoes as if to hit Moses with it. Moses walked away from the car, swaying; he fell face down on the ground and then rolled over on his back. His shirt was bloody.

Danielle Garcia also saw defendant and Moses wrestling on the ground. She was the only witness who said she saw the larger man, Moses, hold the smaller, defendant, in a headlock and punch him.

Lisa Alameda testified that she saw defendant and Jennifer leaving the mall parking lot in their car. The car "was kind of jerking along like they were having trouble getting it to go," but "once they got it going, they went rather quickly." Jennifer was driving and "was very upset, she was crying, kind of hollering, shaking." She and Alameda approached a stop sign from opposite directions; Jennifer was about to drive through the intersection without stopping but was forced to stop when Alameda turned left. Alameda saw defendant, the passenger, throw something out the window. She could not see the item. None of the witnesses saw the knife, and it was never recovered.

Several witnesses testified about defendant and Jennifer's two-day flight after the stabbing. They went first to the home of Dee Pradt, a former girlfriend of defendant. Pradt testified that defendant said he had been in a fight; a man had come at him or Jennifer, so he "stepped in." Defendant had a small injury on his hand. He changed clothes and left the clothes he had been wearing, which had blood on them, at Pradt's apartment. She threw them in a dumpster.

8

Next, Jennifer went to see Cheryl Worthy, who was
defendant's cousin. Jennifer told Worthy she and
defendant were in trouble, and Worthy agreed to rent a
motel room for them in her name. Defendant came to
Worthy's apartment later and asked for money, but she
said she had none.

The next day, defendant went back to Pradt's apartment
and asked her to rent another motel room for him and
Jennifer in her name. Pradt agreed.

Defendant's daughter Sarah and Jennifer's daughter
Sabrina were living with defendant and Jennifer on the
day of the stabbing, as was Jennifer and defendant's
two-year-old son Koby. In the evening of the day of the
stabbing, neighbors picked up the three children at
their house and brought them to the motel where
defendant and Jennifer were staying. Sarah testified
that defendant said "there was an accident at the mall
because [Moses] was trying to come at Jennifer. And he
tried to stop her with a knife, and my dad just took it
from him." He also told Sarah, "'I killed [Moses]
because he was messing with Mom.'" Sarah admitted that
when she spoke to the police, she did not mention that
defendant said Moses was attacking Jennifer with a
knife. Sabrina testified that defendant told her Moses
had gotten hurt and died at the hospital and that they
would have "to take it day by day to see what happens."
On cross-examination by defense counsel, Sabrina added
that defendant said Moses pulled a knife and defendant
took it from him.

In his closing argument, the prosecutor contended that
the crime was first degree murder because defendant
"premeditated, deliberated this murder on the 10-minute
drive towards Valley Plaza." Defense counsel argued
that defendant should be acquitted because he was
defending himself and Jennifer or should be convicted
of a lesser offense because he was reacting to
provocation or a sudden quarrel.

(LD 4, 2-7.)

V.   Standard of Decision and Scope of Review

Title 28 U.S.C. § 2254 provides in pertinent part:

(d) An application for a writ of habeas corpus on
behalf of a person in custody pursuant to the
judgment of a State court shall not be granted
with respect to any claim that was adjudicated
on the merits in State court proceedings unless
the adjudication of the claim—

(1) resulted in a decision that was contrary to,

9

or involved an unreasonable application of, clearly
established Federal law, as determined by the
Supreme Court of the United States; or

(2) resulted in a decision that was based on an
unreasonable determination of the facts in light
of the evidence presented in the State court
proceeding.

Clearly established federal law refers to the holdings, as
opposed to the dicta, of the decisions of the Supreme Court as of
the time of the relevant state court decision.  Cullen v.
Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v.
Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S.
362, 412 (2000).  It is thus the governing legal principle or
principles set forth by the Supreme Court at the pertinent time.
Lockyer v. Andrade, 538 U.S. 71-72.

A state court's decision contravenes clearly established
Supreme Court precedent if it reaches a legal conclusion opposite
to, or substantially different from, the Supreme Court's or
concludes differently on a materially indistinguishable set of
facts.  Williams v. Taylor, 529 U.S. at 405-06.  The state court
need not have cited Supreme Court precedent or have been aware of
it, "so long as neither the reasoning nor the result of the
state-court decision contradicts [it]."  Early v. Packer, 537
U.S. 3, 8 (2002).  A state court unreasonably applies clearly
established federal law if it either 1) correctly identifies the
governing rule but then applies it to a new set of facts in a way
that is objectively unreasonable, or 2) extends or fails to
extend a clearly established legal principle to a new context in
a way that is objectively unreasonable.  Hernandez v. Small, 282
F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529 U.S. at 407.

1  An application of clearly established federal law is unreasonable
2  only if it is objectively unreasonable; an incorrect or
3  inaccurate application is not necessarily unreasonable.
4  Williams, 529 U.S. at 410.

5      A state court's determination that a claim lacks merit
6  precludes federal habeas relief as long as it is possible that
7  fairminded jurists could disagree on the correctness of the state
8  court's decision.  Harrington v. Richter, 562 U.S. -, 131 S.Ct.
9  770, 786 (2011).  Even a strong case for relief does not render
10 the state court's conclusions unreasonable.  Id.  In order to
11 obtain federal habeas relief, a state prisoner must show that the
12 state court's ruling on a claim was "so lacking in justification
13 that there was an error well understood and comprehended in
14 existing law beyond any possibility for fairminded disagreement."
15 Id. at 786-87.  The standards set by § 2254(d) are "highly
16 deferential standard[s] for evaluating state-court rulings" which
17 require that state-court decisions be given the benefit of the
18 doubt, and the Petitioner bear the burden of proof.  Cullen v.
19 Pinholster, 131 S. Ct. at 1398.  Further, habeas relief is not
20 appropriate unless each ground supporting the state court
21 decision is examined and found to be unreasonable under the
22 AEDPA.  Wetzel v. Lambert, --U.S.--, 132 S.Ct. 1195, 1199 (2012).

23     In assessing under section 2254(d)(1) whether the state
24 court's legal conclusion was contrary to or an unreasonable
25 application of federal law, "review... is limited to the record
26 that was before the state court that adjudicated the
27 claim on the merits."  Cullen v. Pinholster, 131 S. Ct. at 1398.
28 Evidence introduced in federal court has no bearing on review

11

1    pursuant to § 2254(d)(1).  Id. at 1400.  Further, as previously

2    noted, 28 U.S.C. § 2254(e)(1) provides that in a habeas

3    proceeding brought by a person in custody pursuant to a judgment

4    of a state court, a determination of a factual issue made by a

5    state court shall be presumed to be correct; the petitioner has

6    the burden of producing clear and convincing evidence to rebut

7    the presumption of correctness.

8         VI.   Instructional Error

9         Petitioner argues that his rights to due process of law and

10   to a trial by jury were denied by the trial court's failure to

11   instruct sua sponte on involuntary manslaughter.  Petitioner

12   theorizes that the evidence supported a conviction for

13   involuntary manslaughter on the basis that Petitioner committed a

14   lawful act of self-defense in an unlawful manner by acting with

15   excessive force in response to the perceived threat posed by his

16   attacker.  Therefore, the trial court was required to instruct on

17   involuntary manslaughter as a lesser included offense of murder.

18   Petitioner contends that the omission denied Petitioner due

19   process of law, the right to have the jury instructed on all

20   elements of the charged offense of murder, and the right to

21   instruction on the defense theory of the case.

22        A.   The State Court Decision

23        Here, the CCA adjudicated Petitioner's claim concerning

24   instructional error on the merits within the meaning of § 2254(d)

25   because it decided the Petitioner's right to relief on the basis

26   of the substance of the constitutional claim raised, rather than

27   denying the claim because of a procedural or other rule

28   precluding state court review of the merits.  See, Lambert v.

12

Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  With respect to the CSC's denial of the petition for review of the CCA's decision, it has been held in this circuit that a state court's decision to deny discretionary review of a state court of appeal's decision on direct appeal in a non-capital case is not a decision on the merits, but rather is only a determination that the California Supreme Court will not consider the case on the merits.  Williams v. Cavazos, 646 F.3d 626, 636 (9th Cir. 2011), cert. grtd. in part,[3] Cavazos v. Williams, --- S.Ct. ----, 2012 WL 104740 (No. 11-465, U.S. Jan 13, 2012) (citing Harrington v. Richter, – U.S. -, 131 S.Ct. 770, 784-85 (2011); Cal. R. Ct. 8.500; and Campter v. Workers' Comp. Appeals Bd., 3 Cal.4th 679 (1992)).  Further, there is a rebuttable presumption that where there is one reasoned state judgment rejecting a federal claim, a later unexplained order upholding the judgment or rejecting the same claim rests upon the same ground.  Ylst v. Nunnemaker, 501 U.S. 797, 801-02 (1991).

Thus, this Court will "look through" the CSC's denial of discretionary review of the CCA's decision, which was the last reasoned state court decision.  Id. at 803-04; Williams v. Cavazos, 646 F.3d at 636; Taylor v. Maddox, 366 F.3d 992, 998 n.5 (9th Cir. 2004.

The pertinent portion of the CCA's opinion is as follows:

II. Omission of involuntary manslaughter instruction

While the jury was deliberating, the court asked counsel to put on the record a discussion about the

---

[3] Certiorari was granted as to the limited issue of whether a habeas petitioner's claim has been "adjudicated on the merits" for purposes of 28 U.S.C. § 2254(d) where the state court denied relief in an explained decision but did not expressly acknowledge a federal-law basis for the claim. Id.

jury instructions that had taken place off the record earlier. One of the points discussed was that defendant did not request, and the court did not give, a jury instruction on involuntary manslaughter:

> "THE COURT: Was there any jury instruction that you think I should have given that I didn't give? ... [¶] ... [¶]
>
> "MR. KATHKA [defense counsel]: No, your Honor.
>
> "THE COURT: We did discuss as far as lesser included that although the court gave the voluntary manslaughter, there simply was no evidence to suggest that the defendant would have been guilty of involuntary manslaughter. [¶] You agree with that, Mr. Kathka?
>
> "MR. KATHKA: I submit I had no argument that it would fall within involuntary manslaughter, your Honor."

Defendant now argues that the court was required to give an involuntary manslaughter instruction on its own motion. His theory is that the jury reasonably could have found that he had no intent to kill and no conscious disregard for life and that the facts confronting him warranted action to defend Jennifer or himself, but that the quantity of force he used to do this was excessive. A killing under those circumstances would constitute involuntary manslaughter. (See *People v. Welch* (1982) 137 Cal.App.3d 834, 840, overruled on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 91.) We review de novo the court's instructions on lesser-included offenses. (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

Involuntary manslaughter generally is a lesser offense necessarily included within the offense of murder. (*People v. Prettyman* (1996) 14 Cal.4th 248, 274.) A trial court must instruct the jury on a lesser-included offense on its own motion when the evidence warrants it; the instruction is not required if there is no evidence that the offense was less than that charged. *(Ibid.; People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.) An erroneous failure to give a lesser-included-offense instruction results in reversal of a conviction only if the error is prejudicial. (*People v. Blakeley, supra*, 23 Cal.4th at p. 93.) Although defendant contends that the omission of the instruction violated his federal constitutional rights, the California Supreme Court has held "that the failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards

of reversibility.... [S]uch misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*People v. Breverman* (1998) 19 Cal.4th 142, 165; see also *People v. Blakeley*, *supra*, 23 Cal.4th at p. 93.) In other words, the harmless-error-review standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, applies. FN2

> FN2. Defendant urges us not to follow *Breverman* and to apply the beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 instead. Declining to follow controlling California Supreme Court authority is not among our options, however. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In this case, we need not decide whether the evidence warranted an involuntary manslaughter instruction. Assuming for the sake of argument that the instruction was appropriate, we conclude that the omission of it was harmless.

As discussed in the previous section of this opinion, the court instructed the jury on two lesser offenses included in first degree murder: second degree murder and voluntary manslaughter. The jury could have convicted defendant of second degree murder by finding that he was sufficiently provoked. It could have convicted him of voluntary manslaughter by finding that he had an intent to kill or a conscious disregard for life but either acted in imperfect self-defense or imperfect defense of another, or that he acted in the heat of passion in response to a sudden quarrel or provocation sufficient to cause a reasonable person to act rashly. The jury rejected all these options and found that defendant intentionally killed Moses and did so willfully, deliberately, and premeditatedly.

The only difference between the instruction the court gave on voluntary manslaughter based on imperfect self-defense or imperfect defense of another (i.e., CALCRIM No. 571), and any similar involuntary manslaughter instruction it could have given, would have been that the voluntary manslaughter instruction included a requirement of an intent to kill or a conscious disregard for life, while the involuntary manslaughter instruction would instead have required only criminal negligence or an act posing a high risk of great bodily injury or death (see CALCRIM No. 580). Given the first degree murder verdict, there is no likelihood that if the jury had received the instruction on involuntary manslaughter, it would have found that there was no willfulness, deliberation, or

premeditation after all, no intent to kill, nor even
any conscious disregard for life, but instead only a
justified decision to use force accompanied by a
criminally negligent failure to confine the force used
to a reasonable amount. Our Supreme Court has
determined that similar failures to give an involuntary
manslaughter instruction were harmless on several
occasions. (*People v. Gutierrez, supra*, 28 Cal.4th at
p. 1145 [failure to give involuntary manslaughter
instruction not reversibly erroneous where jury
rejected voluntary manslaughter and found first degree
murder]; *People v. Prettyman*, supra, 14 Cal.4th at p.
274 [error, if any, in failing to instruct on
involuntary manslaughter harmless where jury rejected
second degree murder and found first degree murder];
*People v. Sedeno* (1974) 10 Cal.3d 703, 721 [failure to
give involuntary manslaughter instruction not
prejudicial where jury rejected second degree murder
and found first degree murder], overruled on other
grounds by *People v. Breverman, supra,* 19 Cal.4th 142.)

(LD 4, 10-13.

      B.  <u>Analysis</u>

    When a conviction is challenged in a proceeding pursuant to
28 U.S.C. § 2254 on the basis of error in jury instructions, a
district court's review is informed by two clearly established
rules.

    First, the United States Supreme Court has held that a
challenge to a jury instruction solely as an error under state
law does not state a claim cognizable in federal habeas corpus
proceedings.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991).  A
claim that an instruction was deficient in comparison to a state
model or that a trial judge incorrectly interpreted or applied
state law governing jury instructions does not entitle one to
relief under § 2254, which requires violation of the
Constitution, laws, or treaties of the United States.  28 U.S.C.
§§ 2254(a), 2241(c)(3).

    This basic, limiting principle is applicable in the present

case, where the target of Petitioner's claim of unfairness is the state court's decision upholding the trial court's failure to instruct sua sponte on a lesser included offense.  Although the Supreme Court has held that the failure to instruct on lesser included offenses can constitute constitutional error in capital cases, Beck v. Alabama, 447 U.S. 625, 638-46 (1980), it has reserved decision on whether such an omission in non-capital cases constitutes constitutional error, id. at 638 n.7.

Accordingly, there is no clearly established federal law within the meaning of § 2254(d) concerning a state court's rejection of a claim that Sixth and Fourteenth Amendment rights in a non-capital case were violated by a failure to instruct on a lesser included offense.  Thus, such a claim is not cognizable in a proceeding pursuant to 28 U.S.C. § 2254.  Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998).

Therefore, Petitioner's claim in this regard should be dismissed.

Petitioner further contends that he suffered violations of his right to have the jury instructed on all elements of the charged offense of murder and on the defense theory of the case.

These contentions bring into operation the second overarching legal principle that governs review of instructional error undertaken pursuant to § 2254.  The only basis for federal collateral relief for instructional error is that the infirm instruction or the lack of instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see, Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)

(noting that it must be established not merely that the instruction was undesirable, erroneous or even "universally condemned," but that it violated some right guaranteed to the defendant by the Fourteenth Amendment).  Further, an instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  Estelle, 502 U.S. at 72.

In addition, in reviewing an ambiguous instruction, it must be determined whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.  Estelle, 502 U.S. at 72-73 (reaffirming the standard as stated in Boyde v. California, 494 U.S. 370, 380 (1990)).  The Court in Estelle emphasized that the Court had defined the category of infractions that violate fundamental fairness very narrowly, and that beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.  Id. at 72-73.

Moreover, even if there is instructional error, a petitioner is generally not entitled to habeas relief for such error unless it is prejudicial.  The Supreme Court has held that harmless error analysis applies to instructional errors as long as the error at issue does not categorically vitiate all the jury's findings.  Hedgpeth v. Pulido, 555 U.S. 57, 61 (2008) (citing Neder v. United States, 527 U.S. 1, 11 (1999) (quoting in turn Sullivan v. Louisiana, 508 U.S. 275 (1993) concerning erroneous reasonable doubt instructions as constituting structural error)).  In Hedgpeth v. Pulido, the Court cited its previous decisions that various forms of instructional error were trial errors

subject to harmless error analysis, including errors of omitting or misstating an element of the offense or erroneously shifting the burden as to an element.  Hedgpeth, 555 U.S. 60-61.

Omission of an instruction on an element of an offense constitutes a violation of the Sixth Amendment right to jury trial and a due process violation, but it is a trial error subject to harmless error analysis.  See, Neder v. United States, 527 U.S. 1 (1999).  Such an error is harmless unless it had a substantial and injurious effect or influence in determining the jury's verdict.  California v. Roy, 519 U.S. 2, 4-6 (1996) (remanding for a determination of whether a failure to instruct the jury that liability for aiding and abetting required an intent or purpose to aid the confederate's crime was harmless); Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Where a judge in a habeas proceeding is in grave doubt as to the harmlessness of the error, the petitioner must prevail.  California v. Roy, 519 U.S. at 5.

Insofar as Petitioner contends that the jury was not instructed on an element of the offense of murder, Petitioner bases his argument on California law that murder is homicide with malice, which in turn requires the absence of mental states or circumstances that could mitigate or negate malice and thereby reduce the offense from murder to manslaughter.[4]  Thus, to fail to instruct on involuntary manslaughter is to give an incomplete definition of malice, which is an element of the charge of

---

[4] Petitioner states that due process requires the state to treat the absence of heat of passion or of imperfect self-defense as part of the definition of murder and thus for the state to have the burden of proving that the accused did not act in the heat of passion or with imperfect self-defense.

1  murder, and thus is to commit an error of constitutional

2  dimension.

3      Here, the evidence reflected that Jennifer Robinson

4  repeatedly attempted over a couple of months before the crime to

5  contact the victim, and it was Petitioner and Jennifer who both

6  traveled to the shopping center to confront the victim.

7  Petitioner advanced on the victim, who had been trying to leave

8  the area before being accosted by Jennifer Robinson, and

9  Petitioner was the apparently armed aggressor in a confrontation

10  with an apparently unarmed victim.  When viewed in the context of

11  the totality of the evidence, the great weight of the evidence

12  reflects that Petitioner had the advantage in the physical

13  confrontation; at the one point when the victim was seen

14  advancing on Petitioner as Petitioner departed, the victim was

15  already staggering from the numerous knife wounds that may

16  reasonably be inferred to have been inflicted by Petitioner.

17      The jury was instructed that provocation could reduce the

18  degree of murder or render the killing voluntary manslaughter,

19  and that to show murder as distinct from voluntary manslaughter,

20  the prosecution had the burden of proof beyond a reasonable doubt

21  that the accused did not kill because of a sudden quarrel or in

22  the sudden heat of passion upon provocation sufficient to cause a

23  person of average disposition to act rashly and without due

24  deliberation.  (IV RT 724-26.)  The jury was specifically

25  instructed that to reduce a murder from the first to the second

26  degree, the weight and significance of the provocation were for

27  the jury to decide.  The jury was further instructed that the

28  prosecution had the burden of proving beyond a reasonable doubt

1   that the killing was not justified because the accused acted in
2   lawful self-defense by using only reasonably necessary force with
3   a reasonable belief that he or Jennifer Robinson were in imminent
4   danger of great bodily injury; if the killing was justified, it
5   was neither murder nor manslaughter.  (Id. at 726-28.)  The jury
6   was instructed that the prosecution had the burden of proving
7   beyond a reasonable doubt that the defendant was not acting in
8   imperfect self-defense or imperfect defense of another (i.e.,
9   defensive action accompanied by an actual but unreasonable belief
10  concerning the presence of an imminent danger of great bodily
11  injury or the necessity of using force); failure to meet that
12  burden required a finding of not guilty of murder.  (Id. at 728-
13  30.)  The jury was further instructed on the limits of an
14  aggressor's privilege of self-defense.  (Id. at 731.)

15       Thus, the instructions given presented the jury with the
16  choice of finding that provocation reduced the degree of the
17  offense, but the jury nevertheless returned a verdict of first
18  degree murder; thus, even under the more subjective, open-ended
19  standard of provocation, the jury declined to find provocation
20  sufficient even to reduce the degree of murder.  Likewise, the
21  jury was given the option of finding Petitioner guilty only of
22  voluntary manslaughter because Petitioner acted in imperfect
23  self-defense or imperfect defense of another, but the jury
24  necessarily rejected the excuse because it found Petitioner
25  guilty of murder.  When viewed in light of all the instructions
26  given, the verdicts reflect the trier of fact's rejection of the
27  pertinent excuses and justifications.

28       If the omission of the instruction were considered to be a

21

failure to instruct on an element of the offense, it would not
have categorically vitiated all the jury's findings or infected
the entire proceedings with unfairness.

With respect to prejudice, consideration of the facts, the
instructions, and the verdicts reflects that the omission did not
have a substantial or injurious effect or influence in
determining the jury's verdict.[5]

Reference to the verdicts reflects that the jury concluded
that Petitioner's mental state was not mitigated by provocation,
sudden quarrel and heat of passion, or imperfect defensive
privileges.  Because the jury found Petitioner guilty of murder,
it found that Petitioner had killed with the affirmative state of
mind required for malice, which under the instructions given was
either intent to kill or the intentional, deliberate commission
of an act with knowledge that the natural consequences were
dangerous to human life and with conscious disregard of the
danger.  (IV RT 722.)  Under California law, for murder the
defendant must have acted with intent to kill or conscious
disregard for life; in contrast, for involuntary manslaughter the
defendant must have acted without intent to kill or conscious
disregard for life.  People v. Rios, 23 Cal.4th 450, 466-67
(2000).  Because the jury affirmatively found that Petitioner did
indeed have either the intent to kill or a conscious disregard
for life, it does not appear that omission of the instruction on
involuntary manslaughter, which involved the distinctly less

---

[5] Brecht provides the appropriate standard of review of trial errors
regardless of whether the state court recognized the error or analyzed it for
harmlessness under the standard of Chapman v. California, 386 U.S. 18 (1967).
Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (concerning evidentiary error).

1 culpable mental element of criminal negligence, had any

2 substantial and injurious effect or influence in determining the

3 jury's verdict.

4 　　　Petitioner argues that omission of the instruction on

5 involuntary manslaughter deprived him of instructions on the

6 defense theory of the case.  It has been recognized that a

7 defendant's right to adequate jury instructions on the theory of

8 the defense case might present an exception to the general rule

9 that failure to instruct on a lesser included offense is not

10 cognizable in a proceeding pursuant to § 2254.  Bashor v. Risley,

11 730 F.2d 1228, 1240 (9th Cir. 1984).

12 　　　Under the Due Process Clause of the Fourteenth Amendment and

13 the Compulsory Process Clause and Confrontation Clause of the

14 Sixth Amendment, it is required that criminal defendants be

15 afforded a meaningful opportunity to present a complete defense.

16 Crane v. Kentucky, 476 U.S. 683, 690 (1986); California v.

17 Trombetta, 467 U.S. 479, 485 (1984).  However, the Supreme Court

18 has characterized its cases as not recognizing a generalized

19 constitutional right to have a jury instructed on a defense

20 available under the evidence under state law.  See, Gilmore v.

21 Taylor, 108 U.S. 333, 343 (1993).

22 　　　It has been held in this circuit that when habeas is sought

23 under 28 U.S.C. § 2254, a failure to instruct on the defense

24 theory of the case constitutes error if the theory is legally

25 sound, and evidence in the case makes it applicable.  Clark v.

26 Brown, 450 F.3d 898, 904 (9th Cir. 2006); see, Mathews v. United

27 States, 485 U.S. 58, 63 (1988) (reversing a conviction and

28 holding that even if a defendant denies one or more elements of

23

the crime, he is entitled to an entrapment instruction whenever
there is sufficient evidence from which a reasonable jury could
find entrapment, and the defendant requests such an instruction).
A habeas petitioner must show that the alleged instructional
error had substantial and injurious effect or influence in
determining the jury's verdict.  Clark v. Brown, 450 F.3d at 905;
Brecht v. Abrahamson, 507 U.S. at 637.

Such an instructional error has been held harmless under the
Brecht standard where other instructions permitted consideration
of the pertinent defensive matter.  Beardslee v. Woodford, 358
F.3d 560, 576 (9th Cir. 2004) (holding that failure to instruct
on manslaughter was not error, but if erroneous was nevertheless
harmless because there was no substantial or injurious effect or
influence in determining the jury's verdict where numerous
instructions allowed the jury to consider the effect of threats
upon the accused's mental state, both as an absolute defense to
all charges and as a factor in choosing between first and second
degree murder, the jury had been given more than the simple
all-or-nothing choice at issue in Beck v. Alabama, 447 U.S. 625,
638-46, and the jury's decision to reject second degree murder
meant that they would not have accepted the lesser charge of
manslaughter).

In closing argument in the present case, defense counsel
challenged the statements of the witnesses to the confrontation
on various grounds and argued that the statement made during the
confrontation by either Petitioner or the victim reflected an
absence of an intent to kill on Petitioner's part.  Defense
counsel characterized the evidence as showing an absence of

premeditation because the encounter began with Petitioner's defense of Jennifer Robinson, but when the victim produced the knife, Petitioner defended himself from an assault and then left with the victim pursuing him.  Defense counsel argued that it was unlikely that Petitioner was armed with a knife throughout the fight because he sustained a cut consistent with reaching out for a knife, and he put the victim in a headlock, an approach that one who had a knife would not use; it was likely that at some point in the scuffle, the victim, who was known to carry a knife, had the weapon and sustained shallow wounds from rolling around during the scuffle. (IV RT 778-96.)

The defense argument was thus consistent with justifiable homicide or voluntary manslaughter; there was no mention of criminal negligence or involuntary manslaughter.  Further, Petitioner did not request any instruction on involuntary manslaughter.

Here, Petitioner was not refused instructions that he requested on any theory that was argued on his behalf.  As in Beardslee, numerous instructions permitted the jury to consider the asserted justifications and excuses, the jury was given a choice, and its rejection of second degree murder and voluntary manslaughter reflected that the jury would not have accepted the lesser charge of involuntary manslaughter.  It is concluded that the failure to give the instruction on manslaughter did not violate Petitioner's right to present a meaningful defense; however, even if it was a violation, it did not have a substantial or injurious effect or influence in determining the jury's verdict.

Therefore, the Court concludes that the state court decision was not contrary to, or an unreasonable application of, clearly established federal law within the meaning of § 2254(d).

Accordingly, it will be recommended that Petitioner's claim or claims concerning the failure to instruct on manslaughter be denied.

VII.   <u>Ineffective Assistance of Counsel</u>

Petitioner contends that his right to the effective assistance of counsel at trial guaranteed by the Sixth and Fourteenth Amendments was violated by trial counsel's inadequate pretrial investigation and trial performance.

With respect to counsel's investigation, Petitioner contends that trial counsel failed to 1) discover that Moses, the victim, had a prior conviction for terrorist threats made to Moses's former girlfriend Catherine Phillips that Petitioner contends was based on facts strikingly similar to the conduct of the victim in the instant case, 2) find and subpoena Phillips to testify, 3) discover and elicit evidence at trial concerning prior threats by Moses to Jennifer Robinson and to Petitioner, and 4) determine whether Petitioner had brought a knife to the encounter with Moses.

With respect to counsel's performance at trial, Petitioner contends that counsel was ineffective because he failed to 1) argue competently the admissibility of evidence concerning the victim's previous incident concerning terrorist threats, 2) examine Jennifer Robinson competently at trial concerning the victim's having threatened her and Petitioner, 3) request a pinpoint instruction on the provocation necessary to reduce first

degree murder to second degree, and 4) present competently the
defense case for manslaughter and request an instruction on
voluntary manslaughter.

A.   Review of the State Court Decision

Petitioner presented his ineffective assistance claim only
to the CSC in his petition for writ of habeas corpus, which was
summarily denied.  (LD 7-8.)

It is unnecessary for a state court to issue an opinion on a
claim in order for a claim to have been adjudicated on the merits
within the meaning of § 2254(d).  A state court's denial of an
original petition for writ of habeas corpus without a statement
of reasons is presumed to have been adjudicated on the merits in
the absence of any indication or state law procedural principles
to the contrary.  Harrington v. Richter, 131 S.Ct. at 784-85.
The presumption may be overcome when there is reason to think
some other explanation for the state court's decision is more
likely.  Id. at 785.  Where a petitioner has failed to show that
the California Supreme Court's decision did not involve a
determination of the merits of his claim, a summary denial of
relief will thus be considered to be an adjudication on the
merits.  Id.

Here, the California Supreme Court denied the petition on
January 21, 2010, without a statement of reasoning or authority.
Because the decision of the California Supreme Court was not
limited to procedural points and purported to be a decision on
the petition as a whole, the Court concludes that the decision of
the California Supreme Court was a decision on the merits.

Where a state court has reached a decision on the merits but

provides no reasoning for the decision, the Court will review the record to determine whether the state court decision was objectively unreasonable.  Cullen v. Pinholster, 131 S.Ct. 1388, 1402.  The petitioner still has the burden to show that there was no reasonable basis for the state court to deny relief. Harrington v. Richter, 131 S.Ct. at 784.  The correct analysis has been described by the Supreme Court as follows:

> [A} habeas court must determine what arguments or theories... could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

Cullen v. Pinholster, 131 S.Ct. 1388, 1402 (citing Harrington v. Richter, 131 S.Ct. at 786).

Accordingly, this Court will review the record to ascertain whether or not the California Supreme Court's decision denying habeas relief on the claim or claims of ineffective assistance of counsel was objectively unreasonable.

B.   Facts in the State Supreme Court

The facts presented to the California Supreme Court in the petition for review will be briefly summarized.

An investigator working on behalf of Petitioner's counsel in this proceeding was easily able to discover records showing that on June 7, 2001, Bakersfield Police Department investigators responded to a distress call made by Catherine Phillips, who informed them she had been in a dating relationship with Moses for about two or three years and had lived with him for about six months.  Since breaking up with Moses six weeks before the call, Phillips had received regular harassing contacts from Moses, who

telephoned her repeatedly.  Her tires were slashed, and she believed that Moses was responsible.  He pulled in front of her in a vehicle as she took lunch from work with a male friend named Boston.  When asked by Phillips to leave her alone, Moses threatened to pour sugar in her gas tank, "fuck your shit up," and "kill her and the guy she was with."  Boston observed Moses follow them as they returned to the work site; when Phillips exited her vehicle to confront Moses, Moses approached Phillips carrying a pistol in his right hand and pointed it at the car door; he then fled after Phillips went into her office.

Phillips had seen Moses with a Glock pistol on a number of occasions when they had cohabited.  Officers following up saw Moses hiding something under a mattress in a girlfriend's residence and found that it was a .177 Crossman Repeater.  Moses denied owning or hiding the gun.  He pled no contest to a misdemeanor charge of making a terrorist threat and agreed to take anger management classes as a condition of probation.  (LD 7, Ex. 3.)

An investigator acting on behalf of Petitioner's counsel in this proceeding located Catherine Phillips, her home address, and her telephone number less than a month and one-half after having been retained to find her.  Phillips declined to provide a declaration because of fear for her safety.

Jennifer Robinson declared that Moses had made violent threats against both her and Petitioner.  (LD 7, Ex. 4.)  Moses once left repeated voice-mail messages of love and numeric texts on her pager; he would text "187," which she understood as the number of the Penal Code section defining murder.  After Jennifer

met Petitioner in August 2000, Moses banged on the windows and doors one night and told Jennifer that she was his and no one else's, and she would never get away from him; he even spoke with Petitioner once on the phone, and when Petitioner told Moses that Jennifer was with him and to leave him alone, Moses threatened bodily harm to Petitioner, who told Moses he would be waiting outside.  When Jennifer began receiving text messages from Moses again, she protested, and Moses told her to watch her back. Jennifer was scared and finally told Petitioner about it just before she moved back into her home in June 2005.  She believed that Moses had spied on her from a flower bed beneath her bedroom window when she lived alone with her children.  Jennifer declared that trial counsel never interviewed her before trial.  (Id.)

Petitioner's present counsel declares that he found no documentation that suggested that trial counsel or anyone acting on his behalf had attempted to interview Jennifer Roginson or find Catherine Phillips, the victim of Moses's prior terrorist threat, or the court file concerning Moses's prior misdemeanor conviction stemming from the incident.  (LD 7, Ex. 5.)

       C.   Ineffective Assistance of Counsel

The law governing claims concerning ineffective assistance of counsel is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Premo v. Moore, –U.S. –, 131 S.Ct. 733, 737-38 (2011); Canales v. Roe, 151 F.3d 1226, 1229 n.2 (9th Cir. 1998).

To demonstrate ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show that 1) counsel's representation fell below

an objective standard of reasonableness under prevailing professional norms in light of all the circumstances of the particular case; and 2) unless prejudice is presumed, it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 687-94 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). A petitioner must identify the acts or omissions of counsel that are alleged to have been deficient. Strickland, 466 U.S. at 690. This standard is the same standard that is applied on direct appeal and in a motion for a new trial. Id. at 697-98.

In determining whether counsel's conduct was deficient, a court should consider the overall performance of counsel from the perspective of counsel at the time of the representation. Strickland, 466 U.S. at 689. There is a strong presumption that counsel's conduct was adequate and within the exercise of reasonable professional judgment and the wide range of reasonable professional assistance. Id. at 688-90. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment." Id. at 687.

In determining prejudice, a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. Strickland, 466 U.S. at 694. In the context of a trial, the question is thus whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt. Id. at 695. This Court must consider the totality of the evidence before the fact finder

and determine whether the substandard representation rendered the proceeding fundamentally unfair or the results thereof unreliable. Id. at 687, 696.

Where the state court has applied the correct, clearly established federal law to a claim concerning the ineffective assistance of counsel, a federal district court analyzes the claim under the "unreasonable application" clause of § 2254(d)(1), pursuant to which habeas relief is warranted where the correct law was unreasonably applied to the facts. Weighall v. Middle, 215 F.3d 1058, 1062-62 (2000) (citing Williams v. Taylor, 529 U.S. 362 (2000)).

The Supreme Court has described the high bar presented by § 2254(d)(1) for prevailing on a claim of ineffective assistance of counsel:

> "To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.' [Strickland,] 466 U.S., at 688 [104 S.Ct. 2052]. A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. Id., at 689 [104 S.Ct. 2052]. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Id., at 687 [104 S.Ct. 2052].

> "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' ...

> " 'Surmounting Strickland's high bar is never an easy task.' Padilla v. Kentucky, 559 U.S. ----, ---- [130 S.Ct. 1473, 1485, 176 L.Ed.2d 284] (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial [or in pretrial proceedings], and so the Strickland standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process

the right to counsel is meant to serve. Strickland, 466 U.S., at 689-690 [104 S.Ct. 2052]. Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' Id., at 689 [104 S.Ct. 2052]; see also Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S.Ct. 2052.

"Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both 'highly deferential,' id., at 689 [104 S.Ct. 2052]; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, Knowles, 556 U.S., at ----, 129 S.Ct., at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at --- [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

Premo v. Moore, 131 S.Ct. at 739-40 (quoting Harrington v. Richter, 131 S.Ct. 770 (2011)).

### 1.   The Victim's Prior Terrorist Threats

Petitioner contends that counsel's failure to investigate the victim's prior conviction and to secure Phillips' testimony resulted in the inadmissibility of the victim's prior conviction. Petitioner argues that this deprived the trier of 1) evidence that the victim had a character trait of violence and acted in conformity with that trait during the fatal confrontation, 2)

corroboration of Jennifer Robinson's testimony that she had been frequently subjected to acts of intimidation and violence by the victim in the past, 3) rebuttal of the prosecutor's argument, premised on the evidence of several witnesses, that the victim was not a violent person, and 4) highly probative evidence bearing on the major issue of who had provoked the fatal fight.

It appears that counsel's apparent omission may have contributed to the trial court's decision not to admit the prior conviction into evidence. However, even if it were assumed that counsel's omission fell below the standard of reasonable professional conduct, a state court could reasonably have concluded that Petitioner could not show any prejudice. The jury had already been informed that the victim had broken an air conditioner by shoving Jennifer Robinson against it, and Moses repeatedly appeared at her home and place of work without an invitation and in an intimidating manner, often banged on the doors and windows of her home, forcibly tried to kiss her, and left many threatening telephone messages. The victim's long and undisputed history of harassing and intimidating contacts with Jennifer Robinson was squarely before the jury.

Further, the trier's consideration of the pivotal issues of provocation and defensive privileges was more directly informed by the facts and circumstances attending the fatal confrontation itself, such as Petitioner's and Jennifer's initiation of the contact, Petitioner's initial aggression and dominance during the course of the physical confrontation, the number and nature of the victim's wounds, and the post-offense flight of Petitioner and Jennifer. It could have been reasonably argued and decided

that counsel's representation met <u>Strickland</u>'s standards because

the admission of more evidence of the victim's history of

threatening and harassing behavior did not render a more

favorable result reasonably probable.  We note that this

reasoning is consistent with the CCA's decision on a related

evidentiary contention raised on appeal concerning evidentiary

exclusion of the conviction.  The CCA ruled that given the lack

of context concerning the details of the prior threat, and

considering its remoteness, exclusion of the evidence was proper

in order to avoid prejudicially confusing the jury:

> Evidence that Moses was convicted of making a criminal
> threat did have some tendency to show that he lacked a
> peaceful character and therefore provided some support,
> consistent with the character-evidence exception
> in Evidence Code section 1103, for defendant's claim
> that Moses was the aggressor. We disagree, therefore,
> with the trial court's view that the evidence had no
> probative value. This value was small, however. The
> jury had no way of knowing what relevant similarities
> and dissimilarities there might have been between
> the situation of the present case and that of the
> prior offense. This meant that the conviction had
> limited value for judging the likelihood that Moses
> was acting in the present case in conformity with the
> character he exhibited in the prior case. Further,
> there was other, more directly relevant evidence
> in support of defendant's claim that Moses was the
> aggressor: Jennifer's claim that Moses was intimidating
> and had shoved her and abused a former girlfriend; her
> assertion that Moses reached for something in
> his coat before he and defendant fought; the testimony
> of Candyce Apple, Moses's fiancée, that Moses had
> two or three pocket knives and typically carried one
> for use in his work; her statement to police, later
> retracted, that one of the knives was not at their
> house after the stabbing and that she was expecting
> to get it back from Moses's employer; Apple's ambiguous
> testimony when asked if Moses was a violent man; FN3
> Sabrina and Sarah's testimony that defendant told them
> Moses pulled a knife; and Danielle Garcia's testimony
> that she saw the larger man holding the smaller man
> in a headlock and punching him. Only some of the evidence
> supporting defendant's version came from interested
> witnesses on defendant's side, so it cannot be said that
> Moses's prior conviction was the only independent

corroboration of that version. In light of this context,
we conclude that the probative value of Moses's prior
conviction was small and that the court did not exceed
the bounds of reason in finding its value to be
substantially outweighed by the potential for confusing
the issues or misleading the jury.

> FN3. "Q. Ms. Apple, did you ever know [Moses]
> to be a violent man?
>
> "A. No, not like-you had to provoke him. He
> didn't-he wasn't-he wasn't an angry person;
> so he didn't just go out to start anything
> like-hard to explain.
>
> "Q. I'm just asking from your personal experience.
>
> "A. No."

For the same reasons, we reject defendant's contention
that the exclusion of the victim's conviction
unconstitutionally denied him the right to present a
defense. In light of the other evidence presented, the
proper exclusion of this marginally significant
evidence pursuant to Evidence Code section 352 did not
deprive defendant of "'a meaningful opportunity to
present a complete defense.'" *(Crane v. Kentucky* (1986)
476 U.S. 683, 690.)

Even if it were error to exclude the evidence, we
conclude the error is harmless under any standard.
Although the evidence supporting defendant's claim that
Moses was the aggressor was significant-enough to
render unimportant the contribution of Moses's prior
conviction, as we have said-the evidence undermining
that claim was far more powerful. Three witnesses saw
defendant holding Moses in a headlock or striking him.
No one ever saw Moses with a knife, but defendant
surely had one, for it is beyond dispute that defendant
stabbed Moses in the heart, the neck, and four other
places. There is no likelihood that if the evidence of
Moses's prior conviction had been admitted, the jury
would have found defendant not guilty or guilty of a
lesser offense.

(LD 4, 15-17.)

Because the state court's decision denying this claim was

not contrary to, or an unreasonable application of, clearly

established federal law concerning the ineffective assistance of

counsel, it will be recommended that the Court deny Petitioner's

claim concerning counsel's failure to investigate and present evidence of the victim's prior conviction.

### 2.   The Victim's Threats to Jennifer and Petitioner

Petitioner contends that trial counsel was prejudicially ineffective for failing to discover and present at trial evidence that the victim previously had made actual threats against Jennifer Robinson and Petitioner.

The jury had before it extensive evidence of the troubled relationship between Jennifer Robinson and the victim, including continuing threats despite Jennifer's marriage to Petitioner. In view of the jury's exposure to significant evidence that Moses posed a threat to Petitioner and Jennifer, it could have been reasonably argued and decided that counsel's representation met Strickland's standards because it resulted in no prejudice. Evidence that in the past Moses had threatened Petitioner during a telephone conversation was not particularly probative in view of the fact that the threat had not been followed through by Moses.  The state court could reasonably have concluded that in view of the strong, direct evidence of Petitioner's guilt, more evidence of the victim's past hostility and sinister intent with regard to Jennifer or Petitioner did not render a more favorable result reasonably probable.

The Court concludes that the state court decision denying Petitioner's claim concerning counsel's failure to discover and present evidence of a history of actual threats made against Jennifer and Petitioner was not contrary to, or an unreasonable application of, clearly established federal law concerning the

ineffective assistance of counsel.

Accordingly, it will be recommended that the claim be denied.

### 3.   Failure to Determine if Petitioner Brought a Knife to the Encounter

Petitioner argues that trial counsel was prejudicially ineffective because he failed to determine if Petitioner brought a knife to his encounter with Moses.  Petitioner contends that if trial counsel had interviewed Petitioner, he would have learned that contrary to Petitioner's unsworn statements made to law enforcement, Petitioner did bring a knife along in the car because of what he knew about Moses's propensity for violence. There is also a reference to his having left the knife in the car.  (Trav., 26-27.)  It does not appear that any specific evidence was submitted with the petition to support the underlying factual assertions concerning Petitioner's conduct with respect to a knife.  Petitioner contends that trial counsel adopted a trial strategy of insisting that Petitioner had come to the confrontation unarmed.  Petitioner complains that this failure enabled the prosecutor to question why Petitioner did not bring a weapon if he was truly frightened, and it resulted in an inability to make a credible argument that Petitioner committed only voluntary manslaughter.

Petitioner has not identified or submitted evidence establishing what his conduct was with respect to arming himself with a knife on the day of the offense.  It is thus unclear what a probing interview of the Petitioner would have revealed to trial counsel.

1    Further, the state court could reasonably have concluded

2  that any failing of counsel in this regard was not prejudicial.

3  Although a failure on Petitioner's part to arm himself for the

4  confrontation tends to undercut an inference that Petitioner

5  feared the victim, Petitioner's arming himself with a knife could

6  support an inference that even before arriving at Moses's

7  location, Petitioner harbored an intention to kill or seriously

8  injure Moses and thus acted maliciously, and that he engaged in

9  the deliberation and premeditation required for first degree

10 murder.  It does not appear that the state court decision was

11 contrary to, or an unreasonable application of, clearly

12 established federal law.

13    It will therefore be recommended that this claim of

14 ineffective assistance of counsel be denied.

15              4.  Omissions concerning Jury Instructions

16    Petitioner argues that his right to the effective assistance

17 of counsel was violated by counsel's failure to request a

18 pinpoint instruction on the provocation necessary to reduce first

19 degree murder to second degree and to request an instruction on

20 involuntary manslaughter.

21    As previously discussed, the jury was instructed that the

22 weight and significance of the provocation to reduce murder from

23 first to second degree, if any, were for the jury to decide; it

24 was also instructed to consider provocation in deciding whether

25 the defendant committed murder or manslaughter.  (IV RT 724.)

26 The jury was thus instructed on how provocation could reduce the

27 degree of murder, and it was not limited to using the standard of

28 an objectively reasonable person.  The state court could

reasonably have applied the standards of <u>Strickland</u> and decided
that it was not reasonably probable that a different pinpoint
instruction on provocation would have brought about a more
favorable result.

Further, as previously analyzed, the jury rejected the
defense's arguments of defensive privilege, imperfect defensive
privilege, and provocation and sudden heat of passion.  The state
court could have reasonably applied the <u>Strickland</u> standard and
concluded that any failure to request instruction on involuntary
manslaughter was not prejudicial because it was not reasonably
probable that a more favorable result would have ensued had the
jury been instructed on involuntary manslaughter.

Accordingly, it will be recommended that Petitioner's
ineffective assistance claims relating to jury instructions be
denied.

VIII.  <u>Request for an Evidentiary Hearing</u>

Petitioner requests an evidentiary hearing regarding his
claims.  (Trav., doc. 23, p. 3.)

The decision to grant an evidentiary hearing is
generally a matter left to the sound discretion of the district
courts.  28 U.S.C. § 2254; Habeas Rule 8(a); <u>Schriro v.
Landrigan</u>, 550 U.S. 465, 473 (2007).  To obtain an evidentiary
hearing in federal court under the AEDPA, a petitioner must
allege a colorable claim by alleging disputed facts which, if
proved, would entitle him to relief.  <u>Schriro v. Landrigan</u>, 550
U.S. at 474.

The determination of entitlement to relief is, in turn, is
limited by 28 U.S.C. § 2254(d)(1), which requires that to obtain

40

relief with respect to a claim adjudicated on the merits in state
court, the adjudication must result in a decision that was either
contrary to, or an unreasonable application of, clearly
established federal law.  Id.  Further, in analyzing a claim
pursuant to § 2254(d)(1), a federal court is limited to the
record that was before the state court that adjudicated the claim
on the merits.  Cullen v. Pinholster, 131 S.Ct. at 1398.

     Thus, when a state court record precludes habeas relief
under the limitations set forth in § 2254(d), a district court is
not required to hold an evidentiary hearing.  Cullen v.
Pinholster, 131 S.Ct. at 1399 (citing Schriro v. Landrigan, 550
U.S. 465, 474 (2007)).  An evidentiary hearing may be granted
with respect to a claim adjudicated on the merits in state court
where the petitioner satisfies § 2254(d)(1), or where
§ 2254(d)(1) does not apply, such as where the claim was not
adjudicated on the merits in state court.  Id. at 1398, 1400-01.

     Here, Petitioner has not satisfied § 2254(d)(1).  It will
therefore be recommended that the request for an evidentiary
hearing be denied.

          IX.  Certificate of Appealability

     Unless a circuit justice or judge issues a certificate of
appealability, an appeal may not be taken to the Court of Appeals
from the final order in a habeas proceeding in which the
detention complained of arises out of process issued by a state
court.  28 U.S.C. § 2253(c)(1)(A); Miller-El v. Cockrell, 537
U.S. 322, 336 (2003).  A certificate of appealability may issue
only if the applicant makes a substantial showing of the denial
of a constitutional right.  § 2253(c)(2).  Under this standard, a

petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  Miller-El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in any procedural ruling.  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the claims in the habeas petition, generally assesses their merits, and determines whether the resolution was debatable among jurists of reason or wrong.  Id.  It is necessary for an applicant to show more than an absence of frivolity or the existence of mere good faith; however, it is not necessary for an applicant to show that the appeal will succeed.  Miller-El v. Cockrell, 537 U.S. at 338.

A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner.  Petitioner has not made a substantial showing of the denial of a constitutional right.

Accordingly, it will be recommended that the Court decline to issue a certificate of appealability.

X.   Recommendations

Accordingly, it is RECOMMENDED that:

1)   The request for an evidentiary be DENIED; and

2)   The petition for writ of habeas corpus be DENIED; and

3)   Judgment be ENTERED for Respondent; and

4)   The Court DECLINE to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within fourteen (14) days (plus three (3) days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   April 30, 2012            /s/ Barbara A. McAuliffe
                                UNITED STATES MAGISTRATE JUDGE